UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FRIENDS OF ANIMALS, *et al.*,

    *Plaintiffs*,

v.

WILBER ROSS,[1] in his official capacity as Secretary of the Department of Commerce, *et al.*,

    *Defendants*.

No. 16-cv-1540 (DLF)

## MEMORANDUM OPINION

The National Marine Fisheries Service (the Service) determined in 2014 that the queen conch, a marine mollusk that inhabits the Caribbean Sea and the Gulf of Mexico, did not warrant listing as an endangered or threatened species under the Endangered Species Act (ESA). The plaintiffs, Friends of Animals (Friends) and WildEarth Guardians (WildEarth), challenge that listing decision as unlawful under § 706 of the Administrative Procedure Act (APA). They ask this Court to vacate the listing decision and order the Service to issue a new one within 60 days. The parties' cross-motions for summary judgment are before the Court. *See* Dkts. 20, 23. For the reasons that follow, the Court concludes that the Service erred in relying on a vacated agency policy in determining that no portion of the queen conch's range was significant. On that basis, the Court will grant plaintiffs' motion in part, deny the Service's motion, vacate the listing decision, and remand to the Service for further proceedings.

---

[1] When this suit began, Penny Pritzker was the Secretary of Commerce. Wilbur Ross was automatically substituted when he became the Secretary. *See* Fed. R. Civ. P. 25(d).

## I. BACKGROUND

### A. The Queen Conch

The Caribbean Sea and the Gulf of Mexico are home to "a large gastropod mollusk" that is shrouded in a "large, whorl-shaped shell with multiple spines at the apex and [a] pink interior of the shell lip." QC40000415.[2] This creature, called the queen conch (or *Strombus gigas*), starts life as one of the several million eggs that an adult female lays each year. *Id.*; QC40000417. A few days after they are laid, the eggs hatch as planktonic larva that float in the water column for fourteen to sixty days; many do not survive. *Id.* Those that do then settle either locally or elsewhere, depending on the currents, and bury into the sea floor. *Id.* They emerge about a year later as juveniles each with a shell about 2.5 inches long. *Id.* They become sexually mature at around four years old. *Id.* Left undisturbed, a healthy queen conch lives for about 30 years. *Id.*

The queen conch "is one of the most important fishery resources in the Caribbean." QC20000016. The demand for queen conch meat, from both the Caribbean markets and markets abroad, drives queen conch fishing activity. *Id.* Thanks to rising international demand, commercial catch rates have increased since the 1980s. *Id.* Queen conch exports peaked in the late 1990s but have since stabilized below those levels. QC20000016–17.

### B. The Endangered Species Act and Related Regulations

The ESA exists to conserve endangered species, threatened species, and those species' ecosystems. 16 U.S.C. § 1531(b); *see Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). A species is *endangered* if it "is in danger of extinction throughout all or a significant portion of

---

[2] This and like-formatted citations refer to pages in the Joint Appendix. *See* Dkt. 29.

its range." 16 U.S.C. § 1532(6).  A species is *threatened* if it "is likely to become an endangered species"—*i.e.*, be in danger of extinction—"within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

The ESA authorizes the Secretary of Commerce to determine whether a marine species like the queen conch warrants listing as endangered or threatened.  *Id.* § 1533(a)(1).  The Secretary has delegated this task to the Service.  50 C.F.R. § 402.01(b).  The Service must base its listing determination on five listing factors: "(A) the present or threatened destruction, modification, or curtailment of [the species'] habitat or range; (B) overutilization [of the species] for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting [the species'] continued existence."  *Id.*

In making a listing determination, the Service must first "conduct[] a review of the status of the species" and "take[] into account those efforts, if any, being made by any State or foreign nation . . . to protect such species."  16 U.S.C. § 1533(b)(1)(A).  And the Service must base its listing decision "solely on . . . the best scientific and commercial data available."  *Id.*; *see* 50 C.F.R. § 424.11.

Any party can petition the Service to list a species.  16 U.S.C. § 1533(b)(3)(A).  Once the Service receives a petition, it has 90 days to publish in the Federal Register a finding on whether the petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted."  *Id.*  If this "90-day finding" determines that the petition presents such information, the Service must "promptly commence" a status review of the species.  *Id.*  The Service then has 12 months to publish in the Federal Register a preliminary finding on whether listing the species is warranted.  *Id.* § 1533(b)(3)(B).  If this "12-month

finding" concludes that listing is warranted, the Service has two options: (1) find that listing is warranted but "precluded by [other] pending [listing] proposals" and thus delay publishing a proposed listing rule; or (2) publish a proposed rule to list the species. *Id.* § 1533(b)(3)(B)(ii)–(iii). If the Service publishes a proposed listing rule, it has one year to choose from three options: (1) extend the one-year period, if there is substantial disagreement about the underlying data; (2) withdraw the proposed rule; or (3) publish a final listing rule. *Id.* § 1533(b)(6)(A)–(B).

### C. The Petition to List the Queen Conch as Threatened or Endangered

WildEarth petitioned the Service on February 27, 2012 to list the queen conch as endangered or threatened under the ESA. QC10000055–76. The Service published a positive 90-day finding on August 27, 2012, determining that "there is substantial information indicating that the petitioned action may be warranted, based on the threats of overutilization for commercial, recreational, scientific or education purposes and other natural or manmade factors." 77 Fed. Reg. 51,763, 51,767. Based on this positive 90-day finding, the Service commenced a status review of the species. *Id.*

The status review started with "a biological review of the species' taxonomy, distribution, abundance, life history, biology, and available information on threats affecting the species' status." QC40000415. The Service compiled this information "into a status report." *Id.* Once it had completed the status report, the Service "established a group of biologists and marine mollusk experts" called the Extinction Risk Analysis (ERA) group. *Id.*

The ERA group "conduct[ed] a threats assessment for the queen conch, using information from the status report." *Id.* This threats assessment required each ERA group member to "independently evaluate the severity, scope, and certainty for [each] threat [to the queen conch] currently and in the foreseeable future." QC40000420. The ERA group members scored their

"perceived severity of each threat" based on five levels of extinction risk, ranging from "no or very low risk" to "very high risk." *Id.*

To score and rank these threats, "[t]he ERA group used the 'likelihood point' method." *Id.* This method required each group member to distribute five "likelihood points" among the five levels of extinction risk for each threat. *Id.* A group member could assign, for example, two points to "very high risk" and three points to "increasing risk" for a particular threat. This approach let the team "express levels of uncertainty when assigning risk categories." *Id.* If the risk level was altogether "unknown," the group member was required to assign all five points to the "unknown" category. *Id.*

The ERA group's threats assessments were not "recommendations as to whether the species should be listed as threatened or endangered." *Id.* Each member instead "drew his or her own scientific conclusions, based on the information in the status report, about the risk of extinction faced by the queen conch under present conditions and in the foreseeable future based on an evaluation and assessment of threats." *Id.*

On top of the status report and the ERA group's assessment, the Service "undertook additional analysis to help [it] better consider the species' current status and extinction risk." QC40000415. "The Southeast Fisheries Science Center (SEFC) and the Southeast Region's Sustainable Fisheries Division (SFD) provided: (1) Queen conch abundance estimates; (2) a meta-analysis of factors affecting the status and health of queen conch; (3) mapping of queen conch densities and oceanographic currents for evaluating dispersal and recruitment of queen conch; and (4) a sustainability index." *Id.* The Service explained that because this information "was prepared after the extinction risk analysis was conducted" the "ERA group did not take into account this information." *Id.*

Based on the status report, the ERA group assessment, and the SEFC and SFD data and analysis, the Service evaluated "whether the queen conch qualifies for threatened or endangered status throughout all of a significant range" based on "any one or a combination of the [five listing] factors." *Id.* In doing so, it defined the "foreseeable future" to be "3 queen conch generations, or 15 years." QC40000419. And it "followed the final policy interpreting the phrase 'significant portion of its range'" to determine that no portion of the queen conch's range was significant. QC4000028–29.

The Service published its listing decision on November 5, 2014. 79 Fed. Reg. 65,628 (Nov. 5, 2014). It determined that "[b]ased on the best scientific and commercial information available . . . the species [did] not warrant listing." QC40000414. It concluded that the queen conch was neither "currently in danger of extinction throughout all or a significant portion of its range" nor "likely to become so within the foreseeable future." *Id.*

**D. The Procedural History of This Case**

The plaintiffs filed this action on July 27, 2016.[3] They claim that the listing decision: "(1) applies the wrong legal and scientific methodologies, including the failure to establish the baseline risks to the species, the failure to disclose the overall extinction risk, improper reliance on the sustainability index, and the improper applications of 'foreseeable future' and 'significant portion of its range'; (2) is not based on the best available science; (3) is contrary to the evidence; (4) applies an incorrect definition of threatened and endangered species; and (5) is otherwise arbitrary, capricious, and contrary to law in violation of the ESA within the meaning

---

[3] This case was transferred to the undersigned on December 5, 2017.

of the APA." Compl. ¶ 90, Dkt. 1. The Service answered the complaint, Dkt. 8, and the parties filed cross-motions for summary judgment, Dkts. 20, 23, which the Court now resolves.

## II. LEGAL STANDARD

A court grants summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A "material" fact is one with potential to change the litigation's substantive outcome. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895. In an APA case like this one, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (citing *Richards v. INS*, 554 F.2d 1173, 1177 (D.C. Cir. 1977)). So "the entire case . . . is a question of law," and the district court "sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (quotation marks and footnote omitted).

The plaintiffs invoke the APA's requirement that a court "hold unlawful and set aside" any aspect of a final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As the party challenging the agency's action, the plaintiffs have the burden of proof. *Pierce v. SEC*, 786 F.3d 1027, 1035 (D.C. Cir. 2015).

When reviewing a final agency action under § 706, courts must be "fundamentally deferential—especially with respect to matters relating to an agency's areas of technical

expertise." *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) (quotation marks and alteration omitted). The court "is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). It must instead determine only whether the agency "relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation" for its decision that "runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Agape Church v. FCC*, 738 F.3d 397, 410 (D.C. Cir. 2013) (quoting *State Farm*, 463 U.S. at 43).

To make this determination, the court looks to the agency's decision not "as would a scientist, but as a reviewing court exercising [its] narrowly defined duty of holding agencies to certain minimal standards of rationality." *Am. Trucking Ass'ns., v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 249 (D.C. Cir. 2013) (alteration adopted and internal quotation marks omitted); *see also Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1263 (D.C. Cir. 1994) (describing the standard as "indulgent"). "When examining . . . scientific determination[s], as opposed to simple findings of fact, a reviewing court must generally be at its most deferential." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983). So "[e]ven an agency 'decision of less than ideal clarity' should be upheld 'if the agency's path may be reasonably discerned.'" *Anacostia Riverkeeper, Inc. v. Jackson*, 798 F. Supp. 2d 210, 222 (D.D.C. 2011) (quoting *State Farm*, 463 U.S. at 43)). In sum, "the agency must explain why it decided to act as it did." *Butte Cty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).

## III. ANALYSIS

### A. Standing

Though the government does not contest standing,[4] the Court still must assess it. An organization like Friends or WildEarth can sue on its members' behalf through "associational standing" when (1) "its members would otherwise have standing to sue in their own right;" (2) "the interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The organization's members would otherwise have standing to sue if they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). So long as the plaintiff seeking review is personally "among the injured," *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972), an "injury in fact" can be to "environmental" interests, "including aesthetic, conservational and recreational . . . interests." *Envtl. Def. Fund v. EPA*, 465 F.2d 528, 531 (D.C. Cir. 1972). To survive a summary judgment motion, the plaintiffs must "submit affidavits or other evidence" to establish standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992).

The Court is satisfied that at least WildEarth meets these requirements. *First*, its members would otherwise have standing to sue. Through sworn declarations, it has established that its individual members derive scientific, aesthetic, conservational, and recreational interests from the queen conch and have concrete plans to do so in the future; that the Service has not

---

[4] Mot. Hr'g Unofficial Tr. 2, Aug. 12, 2019 (the government "do[es] not contest standing in this case).

addressed threats to the queen conch that harm those interests; and that an order directing the Service withdraw its "Not Warranted Finding" and issue a new finding would likely redress such harm.  *See* Angell Decl. ¶¶ 3–9, Dkt. 20-1; Leese Decl. ¶¶ 3–8, ¶ 29, Dkt. 20-2; Molvar Decl. ¶¶ 3–15, Dkt. 20-3.  *Second,* the aesthetic and recreational interests that its members assert are directly related to its "mission and organizational purpose to protect and restore wildlife and wild places," which includes its efforts "to list imperiled species under the ESA in order to stem the extinction crisis in the oceans brought on by human exploitation, habitat destruction, and climate change."  Horning Decl. ¶ 6.  And *third*, the Court's review of the administrative record "as an appellate tribunal" will not require WildEarth's individual members to participate.  *Am. Biosience, Inc.*, 269 F.3d at 1083 (quotation marks and footnote omitted).

Because WildEarth has associational standing, the Court does not address whether Friends of Animals, by not providing evidence about its members' individual standing to sue, failed to establish associational standing.  *See Humane Soc'y of the U.S., et al. v. Sonny Perdue, et al.*, No. 18-5188, slip op. at 8 (D.C. Cir. Aug. 23, 2019) (reiterating "settled law that courts cannot presume the missing facts necessary to establish an element of standing" (quotation marks omitted)).

## B.  WildEarth's Challenges to the Listing Determination

WildEarth asks the Court to vacate the Service's listing determination on numerous grounds.  It challenges the Service's: (1) alleged violation of the "best-available-data" requirement; (2) reliance on a sustainability index that was not peer-reviewed; (3) alleged departure from Service policy in conducting the risk assessment process; (4) determination that the "foreseeable future" was 15 years; (5) finding that the ESA's five listing factors did not warrant listing the queen conch; and (6) finding that the queen conch is not endangered or threatened through a "significant portion of its range."

The Court accepts WildEarth's sixth argument—that the Service erred in its "significant portion of its range" analysis. On that basis, the Court will vacate the listing decision and remand to the Service. Thus, the Court does not consider and expresses no view about WildEarth's other challenges to the listing decision.

As explained, a species need not be endangered or threatened throughout *all* its range to merit listing; being endangered or threatened throughout a "significant portion of its range" is enough. 16 U.S.C. § 1532(6); *id.* 1532(20). But the ESA "does not define what constitutes a species' 'range'" or "what is considered 'significant.'" *Colo. River Cutthroat Trout*, 898 F. Supp. 2d at 201.

In 2011, the Service, along with the U.S. Fish and Wildlife Service, issued a Final Policy interpreting this phrase. 79 Fed. Reg. 37,578 (July 1, 2014) (Policy).[5] This "legally binding" Policy "sets forth the Services' interpretation of 'significant portion of its range' and its place in the statutory framework of the [ESA]." *Id.* Though this was the first interpretation to go through notice-and comment-rulemaking, this was not the Service's first attempt to interpret the phrase; the Ninth Circuit had invalidated an earlier interpretation. *See Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1145–46 (9th Cir. 2001). The 2011 Policy provides that "a portion of the range of a species is 'significant' if the species is not currently endangered or threatened throughout all of its range, but the portion's contribution to the viability of the species is so important that, without the members in that portion, the species would be in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range." *Id.* at 37,579. In other words, a

---

[5] The full title is: Final Policy on Interpretation of the Phrase "Significant Portion of Its Range" in the Endangered Species Act's Definitions of "Endangered Species" and "Threatened Species."

portion is "significant" if without that portion—*i.e.*, if all the species in that portion died—the rest of the species would become endangered or threatened.

On August 1, 2019, fewer than two weeks before a hearing to consider the parties' cross-motions for summary judgment, the Service filed a Notice of Supplemental Authority. *See* Defs.' Notice, Dkt. 34.  It informed the Court of a May 2018 decision from the Northern District of California that—about three-and-a-half years after the queen conch listing decision—deemed the Policy's definition of "significant portion" inconsistent with the ESA.  Defs.' Notice at 2 (citing *Desert Survivors v. U.S. Dep't of Interior*, 321 F. Supp. 3d 1011 (N.D. Cal. 2018)).  In a subsequent order, that court vacated the Policy's definition of "significant portion" nationwide. *Id.* (citing *Desert Survivors U.S. Dep't of Interior*, 336 F. Supp. 3d 1131 (N.D. Cal. 2018)).

Both sides agree that the Service applied this now-vacated Policy in concluding that no portion of the queen conch's range was significant.  *See* Pls.' Br. at 36–37; Defs.' Br. at 39; *see also* QC40000427–28.  WildEarth argues that this was error, and the Service does not disagree.  It says only that "any error [it] made in relying on the then-applicable Policy was harmless in light of the alternative bases for the significance determination provided in the [listing decision]."  Defs.' Notice at 3.  According to the Service, it applied "a more general understanding of significance that weighed biological importance to the species as a whole," in addition to the Policy definition.  *Id.* at 4.  This "alternative rationale" allegedly exists in a single sentence from the Service's listing decision:

> In addition, there is no evidence that suggests that there is a portion of the species' range which encompasses aspects that are important to the species' specific life history events, where loss of that portion would severally [*sic*] impact the growth, reproduction, or survival of the species as a whole.

QC40000428; *see* Defs.' Notice at 4.  The Service suggests that, should the Court determine that this sentence does "not adequately explain this alternative basis," it should "remand to the

12

agency for the limited purpose of providing a more thorough explanation of its [significant portion of its range] decision." Defs.' Notice at 7 n.3.

At the August 12, 2019 hearing on the parties' cross-motions for summary judgment, the Service reiterated that its reliance on the now-vacated Policy was harmless due to this supposed "alternative rationale." The government argued that "the [listing] determination relied on an alternative basis for the decision, and we can argue that that is an alternative basis for the Court to affirm the agency's determination." Mot. Hr'g Unofficial Tr. 4. The plaintiffs disagreed, arguing that "there is no additional analysis beyond the illegal policy" and "where there is no additional explanation other than the illegal policy, the decision must be vacated." *Id.* at 11.

The Court rejects the Service's "alternative rationale" argument. "No principle of administrative law is more firmly established than that a court must review discretionary actions in terms of the rationale on which the agency acted, rather than 'accept appellate counsel's post hoc rationalizations.'" *Ashland Oil, Inc. v. F.T.C.*, 548 F.2d 977, 981 (D.C. Cir. 1976) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 169 (1962)) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943)). This supposed "alternative rationale" originated in the Service's August 1, 2019 Notice to the Court, not in its listing decision, and is thus an impermissible *post hoc* rationalization.

The listing decision itself proves this point. In its listing decision, the Service describes only one definition of "significant portion of its range"—the Policy definition. *See* QC40000427–28. And it makes no mention of an alternative definition. *See id.* The single sentence that allegedly provides this "alternative rationale" (emphasized below) appears between three other sentences that plainly apply the *Policy* definition:

> Therefore, after a review of the best available information, we did not find substantial evidence that would indicate that the loss of queen conch in any portion

> of the species' range would limit the species to the point where it would be in danger throughout all of its range, or likely to become so in the foreseeable future. *In addition, there is no evidence that suggests that there is a portion of the species' range which encompasses aspects that are important to the species' specific life history events, where loss of that portion would severally* [sic] *impact the growth, reproduction, or survival of the species as a whole.* We have evaluated the species throughout its range to determine if there is a portion that is significant and have concluded that the information does not indicate any portion's contribution to the viability of the species is so important that, without the members in that portion, the species would be in danger of extinction. Consequently, we are unable to identify a 'significant portion of its range' for the queen conch that would change the determination relative to the status of the species rangewide.

QC4000028 (emphasis added). This single, isolated sentence does not establish that the Service applied some alternative, unspecified definition of "significant portion."

What is more, this "alternative rationale" is inconsistent with the Service's briefing. In its cross-motion for summary judgment, the Service explained, quoting a portion of this sentence, that "the Service found that there was no portion of the population the loss of which would 'severally [*sic*] impact the growth, reproduction, or survival of the species as a whole.'" Defs.' Br. 43 (quoting QC4000028). And the Service argued that this finding "is what the *policy* requires." *Id.* (emphasis added). The Service's briefing thus confirms that this single sentence was not an alternative rationale but rather mere support for the Service's conclusion that—under the *Policy*—no portion of the queen conch's range was significant.

In sum, the Service's "alternative rationale," which appears nowhere in the agency record, is a *post hoc* rationale. It originated in a supplemental notice that the agency filed nearly 20 months after its summary judgment brief, and this so-called "alternative rationale" conflicts with that very brief. The Court rejects it as such.

That leaves only one rationale for the Service's conclusion that no portion of the queen conch's range was significant: the now-vacated Policy. The Service does not dispute that it erred in relying on that Policy; the Service claims only that it was *harmless* error. *See* Defs.' Notice at

3.  Because the Court rejects the Service's alternative rationale, it disagrees that this error was harmless.  Based on that error, the Court must vacate and set aside the listing decision and remand the case to the agency for further proceedings.  *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998) ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case . . . ."); *Am. Bioscience, Inc.*, 269 F.3d at 1084 (holding that relief on an APA claim "normally will be a vacatur of the agency's order").

## CONCLUSION

For these reasons, the Court grants WildEarth's Motion for Summary Judgment in part and denies the Service's Motion for Summary Judgment.  The Court vacates the listing decision and remands the case to the Service for further proceedings consistent with this opinion.  A separate order accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
August 26, 2019                                                                            United States District Judge